IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **ENDICOTT MCCRAY,** | § | |
| **TDCJ No. 02166048,** | § | |
| | § | |
| **PETITIONER,** | § | |
| | § | |
| **V.** | § | **A-22-CV-796-RP** |
| | § | |
| **BOBBY LUMPKIN, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **RESPONDENT.** | § | |

## ORDER

Before the Court are Petitioner Endicott McCray's ("Petitioner") counseled Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (ECF No. 1), Respondent Bobby Lumpkin's Answer (ECF No. 24), and Petitioner's Reply (ECF No. 25). Having reviewed the record and pleadings submitted by both parties, the Court denies Petitioner's federal habeas corpus petition under the standards prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C. § 2254(d).

## I. Factual Background

In November 2016, Petitioner was charged by indictment with one count of murder; the indictment included one enhancement paragraph listing Petitioner's four convictions for burglary of a habitation on June 7, 2010, in Travis County. (ECF No. 26-2 at 4-6.) On October 27, 2017, a jury convicted Petitioner of the murder charge and he pleaded guilty to the enhancement paragraph; the jury then sentenced Petitioner to sixty-five years imprisonment. *State v. McCray*, No. D-1-DC-16-301466 (147th Dist. Ct., Travis Cnty., Tex. Oct. 27, 2017). (*Id.* at 7-8.) The following is a summary of the factual allegations against Petitioner.

1

In July 2016, Sabrina and Teqnika Moultrie visited family in Austin. At about 2:00 a.m. on July 31, they were walking away from Voodoo Doughnuts in the 6th Street entertainment district when they heard gunshots. Five people, including Teqnika, were shot. Teqnika died on the scene, and three people required hospital treatment for their wounds.

Austin Police Officers Thomas Childress and Luke Werner testified that 6th Street and Voodoo Doughnuts are usually crowded that time of night as patrons leave the bars as they close. Werner remembered that the night of the shooting was "extremely busy. Essentially it was sidewalk to sidewalk, shoulder to shoulder." Sabrina's brother-in-law confirmed that both the donut shop and the street were crowded with people, testifying that the group waited in line for "a tremendously long time" at Voodoo Doughnuts and had just left to find their ride home when Teqnika was shot. Childress testified that at about 2:00 a.m., he and his partner were near Voodoo Doughnuts "breaking up a fight of about 15 people." They were pushing people away and telling them to leave the area when Childress heard four gunshots "fairly close in proximity" to where he was standing, at which point "everybody scattered" and started running away.

Christopher Walker is [Petitioner]'s brother-in-law. He testified that on the night in question, he went to 6th Street with his then-girlfriend, Latoya Walker, and some other friends. He saw [Petitioner] and walked over to ask why [Petitioner] had not gone to [Petitioner]'s daughter's birthday party, which had upset Shante, [Petitioner]'s wife and Walker's sister. Walker said that he "was upset" with [Petitioner] but that he and [Petitioner] did not raise their voices or get argumentative. Walker got nervous that [Petitioner] might have a weapon because he saw [Petitioner] "fidgeting at his waistband" and shoved [Petitioner] out of fear and to try "to get him further away." Walker never saw [Petitioner] with a gun in his hand, but when he was asked whether he "saw the print or kind of the outline of gun in the pants" [Petitioner] was wearing, he said, "Yeah, I seen a print," explaining that the "print" was on the side of his waistband where [Petitioner] was fidgeting. When Walker shoved [Petitioner], [Petitioner] fell backwards but did not lose his footing. Walker backed up and ran, falling at one point, and explained that he ran because he was scared "[o]f getting shot" and that he heard four or five gunshots. Walker ran until the gunshots stopped, and when he stopped running, he saw "a lot of people crying, yelling" and "some people laying down dead like they had been shot." Walker testified that he was wearing a red shirt and a red baseball hat and that he did not remember what [Petitioner] was wearing, whether [Petitioner]'s shoulder-length dreadlocks were down or pulled back into a ponytail, or whether [Petitioner] was wearing a hat. Walker called the police to tell them what had happened after the police contacted his family for information.

Latoya Walker testified that just before the shooting, she saw Walker and [Petitioner] standing face to face talking. She was not close enough to hear their words and said they were not yelling. Latoya had her back to them while she talked to her friends until she heard something that made her turn around. Although she

did not see Walker push or hit [Petitioner], she saw [Petitioner] "just kind of moved back" and then saw [Petitioner] pull a gun from his waistband. Latoya said that the gun appeared to get stuck on [Petitioner]'s pants or belt for a second "and that's when the first shot went off and hit the ground." "Everybody started running" after the first shot, and Latoya testified that she saw [Petitioner] raise the gun and aim it, saying she saw the gun "the entire time it was up" and that "when [Petitioner] was shooting, he was running kind of backwards with the gun." However, she also agreed when she was asked on cross-examination whether she "heard the shots ring out as [she was] running" and whether she was "running away from that situation." Latoya testified that she heard four or five gunshots, and she did not remember what [Petitioner] was wearing or whether he was wearing a hat.

Juliana Gibbs was out with Latoya and Christopher on the night of the shooting and said that 6th Street that night "was chaos"--"[t]here was people everywhere. There was fights everywhere. There were lots of drunk people around. There was a lot of screaming, partying." She testified that she found herself in a crowd surrounding a fight, but she did not "see the actual fighting that was going on." Gibbs heard a commotion and remembered "being pushed really hard, and I remember feeling a lot of pressure" as she was shot. She did not see the gun and only heard gunshots. Gibbs testified that a police officer spoke to her at the hospital, showed her a photograph, and said "this is the person who shot you." She said she did not know [Petitioner] and "had never seen him."

Desiree Torres was also shot in the incident. She testified that she saw [Petitioner] arguing with a man in a white shirt, who pushed [Petitioner]. [Petitioner] then pulled a gun from his waistband using his right hand, and Torres said, "I just hear he's got a gun, I see the gun, and I start running ... but that's when I got shot." Torres said she was about fifteen feet from [Petitioner] and described his clothing as "a red polo and jeans that were kind of saggy, also a black cap, and he had some dreadlocks." She could not remember if she had described [Petitioner]'s clothing when she gave a statement to the police after the shooting.

Crystal Cordero testified that she was on 6th Street on the night of the shooting and that her friend was shot in her ankle. Cordero testified that she panicked when she heard gunshots. She started to run but saw "a person lying on the ground who appeared lifeless" and thought, "[O]h, my God, I'm running the wrong direction. I'm running in the direction of the gunshots. So I panicked for another second, and when I looked up is when I saw the shooter." Cordero testified that the man was about five-foot, nine-inches tall, slender, African-American, and light skinned and that he "appeared to have cornrows, hair about shoulder length or to the back of his neck." She explained that "[t]he only reason that he stood out to me was because amidst the chaos and everybody running and trying to hide and getaway, he was standing still and his face looked angry. It just didn't match what everybody else was doing." Cordero testified that she saw the man "lowering a black handgun in his right hand" and explained that she saw him "[a]fter the shots had been fired." She did not recall what the shooter was wearing and thought that his cornrows were

3

down and not pulled into a ponytail. Cordero was not asked to identify [Petitioner] at trial as the shooter.

Police investigators found five cartridge casings at the scene, four of which were located in the middle of the street across from Voodoo Doughnuts, in close proximity to a black baseball hat. The hat was not subjected to DNA or other testing and the witnesses could not say with certainty that it was the hat [Petitioner] wore in one of his social media photos; however, one witness testified that both hats have a brand-name sticker and a rectangular price sticker and that the position of the stickers on both hats are "consistent" with each other. The police also recovered a cell phone and a red baseball hat belonging to Walker, apparently dropped as he fled, on or near the sidewalk in front of Voodoo Doughnuts; found two bullet holes in nearby structures; and recovered four "projectiles" from the scene or the victims. A firearms examiner tested the casings and projectiles and testified that all four of the projectiles were "consistent with a 40-caliber," were "full metal jacket with a flat point design," and had "rifling characteristics consistent with a Glock type firearm with polygonal riffling." However, "because they were fired through a polygonal rifle barrel," the expert could not positively state that they were fired from the same gun, although neither could he eliminate that possibility. As for the casings, four of them were 40-caliber Smith & Wesson cartridges marketed by Federal, and the firearms examiner testified that they were "positively identified as having been fired in the same gun" and had characteristics "consistent with Glock-type firearms," although he could not say the particular type of gun. He tested a fifth cartridge that was found at the scene and determined that it was a different brand of ammunition fired by a different gun.

Finally, the State presented testimony that about thirty-five minutes after the murder, a man matching [Petitioner]'s description, driving his vehicle, and using his credit card bought gas about nine miles from the scene. A detective testified that the security footage from the gas station shows that the man's hair is in dreadlocks that are darker at the top and lighter in color at their ends. Later that day, July 31, [Petitioner]'s vehicle was "discovered abandoned" "fairly close" to his residence, and [Petitioner]'s sister's vehicle was seen in Shreveport, Louisiana at about 1:00 a.m. on August 1 and then found abandoned in Birmingham, Alabama. The detective also testified that [Petitioner] started "turning his phone on and off in what we believed to be an effort to avoid detection" and then "completely switched to a different phone altogether, and the number we had been tracking went silent." [Petitioner] was ultimately arrested in Georgia on August 3, by which time [Petitioner] "had drastically changed his appearance." In a jail call between [Petitioner] and his wife, Shante Walker, he tells Shante that he rode in a train boxcar to Atlanta, Georgia, and Shante tells [Petitioner] that it took her thirty minutes to explain to her mother "how you took your dreads out."

*McCray v. State*, No. 03-17-00734-CR, 2021 WL 627537, at *1-3 (Tex. App.--Austin, Feb. 18,

2021, pet ref'd). On direct appeal, Petitioner challenged the sufficiency of the evidence supporting

4

(1) his identity as the shooter and (2) the allegation that he had fired a gun into a crowd of people. *Id.* at *3-4. On February 18, 2021, Petitioner's conviction was affirmed on appeal. *Id.* Petitioner raised these same issues in his Petition for Discretionary Review (PDR), which the Texas Court of Criminal Appeals (TCCA) refused on May 19, 2021. *McCray v. State*, No. PD-0194-21 (Tex. Crim. App. May 19, 2021). Petitioner did not file a petition for a writ of certiorari with the United States Supreme Court. (ECF No. 1 at 28.)

On May 31, 2022, Petitioner filed his first counseled state habeas corpus application. (ECF No. 9-3 at 3-19.) Before his state habeas application had been adjudicated, Petitioner filed his federal petition for writ of habeas corpus on August 10, 2022. (ECF No. 1.) On September 14, 2022, the TCCA dismissed Petitioner's state habeas application without written order as non-compliant. *Ex parte McCray*, No. WR-94, 01-01. (ECF No. 9-1.) On November 14, 2022, this Court ordered Petitioner's federal petition stayed until he exhausted his claims in state court. (ECF No. 14.)

On December 12, 2022, Petitioner filed his second state habeas corpus application, listing the following three claims:

1.  Petitioner's trial counsel rendered ineffective assistance of counsel when counsel failed to

    a.  demonstrate that Juliana Gibb's identification of Petitioner amounted to an unconstitutional showup;
    b.  cross-examine and impeach Detective Fugitt[1] regarding inconsistencies in suspect descriptions;
    c.  retain, consult with, and adduce testimony from an eyewitness expert regarding the unreliability of eyewitness testimony;
    d.  interview and call witnesses to testify on Petitioner's behalf;
    e.  argue the eyewitness evidence amounted to prejudicial and improper false evidence;
    f.  obtain DNA testing of the hat left at the crime scene.

---

[1] Petitioner and Respondent misspell Detective Fugitt's name as "Fugit." The Court substitutes the correct spelling.

2. Petitioner was prejudiced by police and prosecutorial misconduct through the showup procedure, questionable witness practices, and because the Austin Police Department (APD) withheld exculpatory/impeachment evidence.

3. Petitioner is entitled to relief because he is actually innocent and was only convicted due to the false eyewitness evidence.

(ECF No. 26-2 at 11-27.) On July 26, 2023, the TCCA denied Petitioner's application without written order on the findings of the trial court without hearing and on the court's independent review of the record. *Ex parte McCray*, No. WR-94,081-02 (Tex. Crim. App. July 26, 2023.) (ECF No. 26-1 at 1.)

On August 7, 2023, Petitioner moved to lift the stay, which the Court granted. (ECF No. 23.) Petitioner's federal petition lists the same grounds for relief as his state habeas corpus application,[2] along with the two additional grounds he exhausted on direct appeal. (ECF No. 1.) Respondent Lumpkin has answered the petition (ECF No. 24), to which Petitioner has replied (ECF No. 25).

## II. Standard of Review

Petitioner's federal habeas petition is governed by the heightened standard of review provided by AEDPA. *See* 28 U.S.C. § 2254. Under § 2254(d), a petitioner may not obtain federal habeas corpus relief on any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005). This demanding standard stops just short of imposing a

---

[2] In his federal petition, Petitioner omits two bases of relief for his ineffective-assistance claim: (1) failure to interview and call witnesses to testify on Petitioner's behalf; and (2) failure to argue that eyewitness evidence was improper and prejudicial. Accordingly, the Court will not review the denial of Petitioner's state habeas application on these grounds.

complete bar on federal court re-litigation of claims already rejected in state proceedings. *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)).

A federal habeas court's inquiry into unreasonableness should always be objective rather than subjective, with a focus on whether the state court's application of clearly established federal law was "objectively unreasonable" and not whether it was incorrect or erroneous. *McDaniel v. Brown*, 558 U.S. 120 (2010); *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). A petitioner must show that the state court's decision was objectively unreasonable, not just incorrect, which is a "substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *Richter*, 562 U.S. at 102. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). As a result, to obtain federal habeas relief on a claim previously adjudicated on the merits in state court, Petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. "'If this standard is difficult to meet—and it is—that is because it was meant to be.'" *Mejia v. Davis*, 906 F.3d 307, 314 (5th Cir. 2018) (quoting *Burt v. Titlow*, 571 U.S. 12, 20 (2013)).

### III. Analysis

1. Evidentiary Hearing

Petitioner requests an evidentiary hearing to "satisfy the gateway showing of actual innocence." (ECF No. 1. at 53.) Habeas petitioners are not entitled to a federal evidentiary hearing

to develop new evidence to attack the state court's resolution of their claims. *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011) ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."). Under the AEDPA, the proper place for development of the facts supporting a claim is the state court. *See Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir. 1997) (holding the AEDPA clearly places the burden on a petitioner to raise and litigate as fully as possible his federal claims in state court). When, as here, a petitioner's claims have been rejected on the merits by the state courts either on direct appeal or during a state habeas corpus proceeding, further factual development in federal court is effectively precluded. *See Pinholster*, 563 U.S. at 181-88 (2011) (holding an evidentiary hearing is unnecessary when a state court has rejected a claim on the merits and federal habeas review of that rejection is governed by § 2254(d)(1)); *Woodfox v. Cain*, 772 F.3d 358, 368 (5th Cir. 2014) ("The Supreme Court has clarified that when a claim is adjudicated on the merits, for the purposes of review under § 2254(d)(1), the record is limited to the one before the state court, even if the state court issued a summary affirmance.").

Where a federal petitioner's claims lack merit on their face, further factual development is not necessary. *See Register v. Thaler*, 681 F.3d 623, 627-30 (5th Cir. 2012) (recognizing the discretion inherent in district courts to allow factual development, especially when confronted with claims foreclosed by applicable legal authority). "'In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court.'" *Richards v. Quarterman*, 566 F.3d 553, 562 (5th Cir. 2009) (quoting *Schriro*, 550 U.S.465, 468 (2007)). As discussed below, Petitioner's allegations lack merit and further factual development is unwarranted. Petitioner's request for an evidentiary hearing is denied.

2. Insufficient Evidence (claims 1-2)

In Petitioner's first two claims, he argues the state court erred in determining there was sufficient evidence to support his conviction. Specifically, Petitioner argues there was insufficient evidence identifying him as the shooter and showing he fired a gun into a crowd of people.

The standard for testing the sufficiency of evidence in a federal review of a state court conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. *United States v. Leahy*, 82 F.3d 624, 633 (5th Cir. 1996). The AEDPA further imposes a "twice-deferential standard" when a federal court reviews a state prisoner's claim challenging the sufficiency of the evidence. *Parker v. Matthews*, 567 U.S. 37, 43 (2012). As the Supreme Court explained:

> The opinion of the Court in *Jackson v. Virginia* . . . makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

*Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (citing *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

Petitioner raised these claims in his direct appeal and in his PDR, which the TCCA refused. He did not raise them in his state habeas application. Accordingly, the Texas Third Court of Appeals has the last reasoned state court judgment for these claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("[w]here there has been one reasoned state judgment rejecting a federal

9

claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.") Regarding Petitioner's insufficiency claim as to his identity, the Third Court of Appeals reasoned as follows:

> In his first issue, appellant argues that the evidence is insufficient to prove he was the shooter that night. He insists that "[a]ny number of guns" could have fired the fatal shot, noting that the firearms examiner could not conclusively state that all of the spent bullets were fired by the same gun, that a fifth cartridge found at the scene was determined to have come from a different gun, and that there was testimony that "shots are fired frequently in that part of town." He further notes that Torres only saw him holding a gun and did not see him actually fire the gun and argues that, at best, the State proved that he pointed a gun at Walker, and then "only if Latoya Walker's testimony is believed."
>
> Appellant asserts that the State did not present a witness who could testify that they actually watched appellant fire his gun toward Teqnika. However, several witnesses provided testimony linking appellant to a gun. Walker testified that he pushed appellant because he was nervous about appellant "fidgeting" with his waistband, where Walker saw a "print" of a gun. Cordero testified that immediately after the shooting, she saw a man who matched appellant's appearance standing still—in contrast to the chaos around him—lowering a handgun, and looking angry, and Torres testified that she saw appellant with a gun just before the shooting started. Further, Latoya testified that she saw appellant pull a gun from his waistband, fire one shot down toward the ground; that he raised and aimed the gun, "shooting" as he moved backwards; and that she heard four or five shots as she ran away. In addition, there was expert testimony that four of the five cartridges found at the scene were 40-caliber cartridges fired from the same gun, "consistent with Glock-type firearms," and that the four projectiles retrieved from the victims and the scene were "consistent with a 40-caliber" and had "rifling characteristics consistent with a Glock type firearm." A police officer testified that various witnesses gave differing descriptions of the shooter's clothing but that inconsistency in such details is not concerning because in such a chaotic scenario, "it's typical that [witnesses] may confuse the clothing articles that are being worn by one person as opposed to another. It's not that concerning." Finally, the Court of Criminal Appeals has explained that "a factfinder may draw an inference of guilt from the circumstance of flight," *Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007), and the State presented evidence that appellant fled Austin after the shooting, abandoning his car in Austin and driving his sister's car through Louisiana and Alabama before abandoning it and getting onto a train to Georgia, and changed his appearance by removing his distinctive dreadlocks.

*McCray*, 2021 WL 627537 at *3. Regarding Petitioner's claim that there was insufficient evidence

supporting the jury's conclusion that he fired a gun into a crowd, the Third Court of Appeals held

as follows:

> In his second issue, appellant argues that there was no evidence that he fired a gun
> in the direction of a crowd of people. He contends that there were many people in
> the area and that discharging a firearm in a crowded area "is not the same as firing
> into or in the direction of a crowd." Because the jury charge allowed the jury to find
> him guilty if it found one of several manner and means of committing the offense,
> including several that required a finding that he fired into a crowd, appellant argues,
> some of the jurors might have convicted him based on a manner and means for
> which there was insufficient evidence.
>
> Appellant asserts that "[d]ischarging a firearm while in a place where there are
> many people is not the same as firing into or in the direction of a crowd of people"
> but cites to no authority for that proposition. Further, the evidence shows that 6th
> Street in general was crowded and that specifically there was a large number of
> people at or near Voodoo Doughnuts, with Werner testifying that the people were
> "shoulder to shoulder," from "sidewalk to sidewalk," and with Sabrina's
> brother-in-law testifying that he, Teqnika, and their friends waited for their donuts
> for "a tremendously long time." "Crowd," in normal usage, is defined as "a large
> number of persons especially when collected together" or "a large number of things
> close together," Crowd, Merriam-Webster.com, https://www.merriam-webster.
> com/dictionary/crowd (last visited Jan. 29, 2021), or as a "large number of people
> gathered together in a disorganized or unruly way," Crowd, Lexico.com,
> https://www.lexico.com/en/definition/crowd (last visited Jan. 29, 2021). And
> several people in the crowded area were struck by bullets, thus supporting a finding
> that appellant fired "into" or "in the direction of" the crowd. We hold that the
> evidence is thus sufficient to support a conclusion that appellant fired his firearm in
> the direction of a crowd. The Court of Criminal Appeals has held that "when a jury
> returns a guilty verdict on an indictment charging several acts in the conjunctive, ...
> the verdict stands if the evidence is sufficient with respect to any of the acts
> charged." *Kitchens v. State*, 823 S.W.2d 256, 259 (Tex. Crim. App. 1991) (quoting
> *Turner v. United States*, 396 U.S. 398, 420 (1970)).

*Id.* at *4.

In his federal habeas petition, Petitioner argues that the Court of Appeals holding was

erroneous because there were contradictory accounts of what the shooter was wearing in a chaotic

crime scene; that the Chicago Bulls hat found at the crime scene was not DNA-tested and therefore

was not necessarily Petitioner's; and that the ballistic evidence could not be clearly tied to

11

Petitioner's gun. As stated above, the initial reviewing court may only set aside a jury's verdict based on insufficient evidence if no rational trier of fact could have agreed with the jury. Here, in overruling Petitioner's claims on direct appeal, the state appeals court found there was sufficient evidence to support both Petitioner's identity and his action of firing a gun into a crowd. On federal review, the Court is limited to determining if the state court's decision was objectively unreasonable. Given the breadth of evidence supporting Petitioner's conviction, as summarized by the Third Court of Appeals, the Court concludes the state court's decision denying these claims was not objectively unreasonable. Accordingly, these claims are denied.

3. Ineffective Assistance of Counsel (claim 3)

In Petitioner's third claim, he argues he received ineffective assistance of counsel when his trial counsel failed to (1) argue Juliana Gibb's identification of Petitioner amounted to an unconstitutional showup; (2) cross-examine and impeach Detective Fugitt regarding inconsistencies in suspect descriptions; (3) retain, consult with, and adduce testimony from an eyewitness expert regarding the unreliability of eyewitness testimony; and (4) obtain DNA testing of the Chicago Bulls hat left at the crime scene.

The Sixth Amendment to the United States Constitution guarantees citizens the assistance of counsel in defending against criminal prosecutions. U.S. CONST. amend VI. Sixth Amendment claims based on ineffective assistance of counsel are reviewed under the familiar two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner cannot establish a violation of his Sixth Amendment right to counsel unless he demonstrates (1) counsel's performance was deficient and (2) this deficiency prejudiced the petitioner's defense. *Id.* at 687-88, 690. The Supreme Court has emphasized that "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

12

When determining whether counsel performed deficiently, courts "must be highly deferential" to counsel's conduct and a petitioner must show that counsel's performance fell beyond the bounds of prevailing objective professional standards. *Strickland,* 466 U.S. at 687-89. Counsel is "'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Burt*, 571 U.S. at 22 (quoting *Strickland*, 466 U.S. at 690). To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Under this prong, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693). A habeas petitioner has the burden of proving both prongs of the *Strickland* test. *Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

Ineffective assistance of counsel claims are considered mixed questions of law and fact and are analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *See Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010). When the state court has adjudicated the claims on the merits, a federal court must review a petitioner's claims under the "doubly deferential" standards of both *Strickland* and Section 2254(d). *See Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (citing *Cullen*, 563 U.S. at 190). In such cases, the "pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standard," but whether "the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S at 101.

a. *Unconstitutional showup*

Petitioner first argues that his trial counsel—Russell Hunt, Jr., and Margaret Kercher—provided ineffective assistance of counsel when they failed to argue that the Juliana Gibbs's identification of Petitioner was produced via an unreliable and highly prejudicial showup

procedure. As stated in the state court of appeals's opinion, "Gibbs testified that a police officer spoke to her at the hospital, showed her a photograph, and said 'this is the person who shot you.' She said she did not know [Petitioner] and 'had never seen him.'" *McCray*, 2021 WL 627537 at *2.

> Petitioner's counsel, Mr. Russell Hunt, responded to this allegation as follows:
>
> 3. In preparing the defense of the case, I reviewed the voluminous discovery in the case, engaged a private investigator and co-counsel, and met with [Petitioner] on multiple occasions. [Petitioner] was fully apprised of the defense approach and strategy, as well as his ability to testify in his own defense. [Petitioner] was aware of the long odds against victory at trial and chose to try the case rather than accept a long penitentiary sentence in a plea bargain for the offense charged. Development of trial strategy was rather straightforward, and [Petitioner] understood and was agreeable to our goal of raising reasonable doubt wherever the evidence presented it.
>
> . . . .
>
> 6. Trial Strategy: Attorneys Hunt and Kercher pursued two primary defensive strategies in trial: first to show that the Austin Police Department had "rushed to judgment" of [Petitioner] without fully investigating the case; and second, that the identification of [Petitioner] as the shooter was questionable due either to confusion, tainted perception, or negative motivation of the witnesses.
>
> 7. Failure to challenge Juliana Gibbs' identification of [Petitioner]: First, Ms. Gibbs did not identify [Petitioner] in trial. On the contrary, Ms. Gibbs' testimony at trial reflected that when she was in the hospital following the shooting, an officer showed her a single picture of [Petitioner], and told her that [Petitioner] was the shooter rather than her telling that to the officer. Detective Fugitt was cross-examined thoroughly regarding this questionable police procedure in an effort to reinforce the "rush to judgment" defense argument.

(ECF No. 26-4 at 191-92.) The state habeas court made the following findings in recommending the denial of this claim:

> 15. To prepare a defense for this case, Mr. Hunt reviewed discovery provided by the State, engaged a private investigator, and met with [Petitioner] on "multiple occasions."
>
> 16. Mr. Hunt describes [Petitioner] as "fully apprised of the defense approach and strategy, as well as his ability to testify in his own defense" and states the

development of a trial strategy was "rather straightforward" with a goal of "raising reasonable doubt wherever the evidence presented it" and that [Petitioner] understood and was agreeable to this goal.

17. Mr. Hunt further recalls that [Petitioner] was "aware of the long odds against victory" in a jury trial but opted for a trial instead of accepting an offer from the State involving a long prison sentence.

18. Mr. Hunt describes the defense's approach as twofold, to advocate that: 1) the Austin Police Department (APD) had "rushed to judgment" without "fully investigating the case;" and 2) that the identification of [Petitioner] as the shooter was questionable.

19. Mr. Hunt's defense theory of the case is evident in voir dire, where he directed his questions of the panel to topics such as jumping to conclusions, credibility of witnesses, and the reliability of eyewitness identification.

. . . .

22. At trial, State's witness Juliana Gibbs testified that Sixth Street (where the murder occurred) on that particular night was "chaos," with people and fights "everywhere" and "lots of drunk people around" and "a lot of screaming, partying."

23. Ms. Gibbs went on to testify that she was shot during this incident but never saw the gun and only heard the shots.

24. Contrary to [Petitioner]'s claim, Ms. Gibbs did not identify [Petitioner] as the shooter at trial.

25. Ms. Kercher established on cross-examination that, while Ms. Gibbs was in the hospital receiving medical treatment, she was shown a photo of [Petitioner] by APD and was told that he was the person who had shot her.

26. Mr. Hunt argued to the jury in closing argument that it was improper and suggestive for APD to have shown Ms. Gibbs a photo of [Petitioner] and that the officers might have done that with other witnesses.

(*Id.* at 183-84) (record citations omitted).

The state habeas court concluded that Ms. Gibbs did not identify Petitioner as the shooter during trial and further concluded that trial counsel argued in closing that the APD's actions regarding Ms. Gibbs were improper and could have been their approach with other witnesses. Petitioner fails to address these findings in his federal petition, instead restating his arguments

from his state habeas application. As a result, Petitioner fails to rebut, with clear and convincing evidence, the presumption of correctness the Court affords the state court's factual findings. 28 U.S.C. § 2254(e)(1). Further, Petitioner also fails to show that the state habeas court's conclusion that he did not suffer prejudice is an unreasonable application of clearly established federal law: as Respondent points out, at least two other witnesses—Latoya Walker and Chris Walker—personally knew Petitioner and identified him as the shooter. Accordingly, the state habeas court's application of *Strickland* to this claim was not unreasonable and it is denied.

      *b.  Failure to cross-examine and impeach Detective Fugitt*

In Petitioner's next claim, he argues his trial counsel provided ineffective assistance when they failed to adequately investigate the contradictory witness descriptions of the shooter and then use this information to impeach Detective Fugitt's testimony. Specifically, Petitioner argues that, although APD gathered eleven witness statements on the night of the shooting, only two witnesses testified, with the remainder of the witnesses making contradictory statements about the shooter's clothing. Petitioner further argues trial counsel could have impeached the witnesses' testimony based on the chaotic circumstances during the shooting. He finally argues that trial counsel failed to thoroughly cross-examine Detective Fugitt regarding his "hasty" decision to pinpoint Petitioner as the shooter.

Mr. Hunt addressed these allegations as follows:

8. <u>Failure to cross examine Detective Fugitt regarding inconsistent witness descriptions of the shooter</u>: Attorney Hunt thoroughly cross-examined Detective Fugitt regarding the multiplicity of eyewitness descriptions of the shooter, and on the impropriety of strongly suggesting the identity of [Petitioner] as the shooter to an eyewitness. Attorney Hunt also questioned Detective Fugitt about his early focus on [Petitioner] as the shooter and his resulting failure to fully develop the investigation, in furtherance of our "rush to judgment" argument.

(ECF No. 26-4 at 192). In recommending the denial of this claim, the state habeas court made the following findings:

> 27. Mr. Hunt attempted to raise reasonable doubt through his cross examination of Det. Fugitt by establishing that it is important to double-check identification of a known assailant because of the possibility of a deliberate misidentification and further questioned him about the possibility of an honest mistake regarding identification.

> 28. Mr. Hunt addressed with Det. Fugitt the range of descriptions of the shooter's clothing provided to law enforcement, the chaotic and crowded environment in which the murder took place, statements about straight vs. ricocheted shots, and the witnesses that he did not reach during his investigation.

> 29. Mr. Hunt spent a good portion of closing argument alleging Det. Fugitt and APD's "rush to judgment."

> 30. The record supports Mr. Hunt's and Ms. Kercher's assertions that Mr. Hunt "questioned detective Fugitt about his early focus on [Petitioner] as the shooter and his resulting failure to fully develop the investigation" in order to further their "rush to judgment" theory of the case.

(*Id.* at 184-85) (record citations omitted).

Under *Strickland*, a reasonable investigation requires, at minimum, that trial counsel interviews potential witnesses and makes an independent investigation of the facts and circumstances of the case. *Kately v. Cain*, 704 F.3d 356, 361 (5th Cir. 2013). In assessing the reasonableness of counsel's investigation, a heavy measure of deference is applied to counsel's judgments and is weighed along with the defendant's own statements and actions. *Strickland*, 466 U.S. at 691. Trial counsel also has wide latitude in determining trial strategy. *See Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir. 2015). In fact, "[d]efense counsel's 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Mejia*, 906 F.3d at 316 (quoting *Rhoades v. Davis*, 852 F.3d 422, 434 (5th Cir. 2017)). Further, "*Strickland* does not allow second guessing of trial strategy and must be applied with keen awareness that this is an after-the-fact inquiry." *Granados v. Quarterman*, 455 F.3d 529,

17

534 (5th Cir. 2006). As a result, an unsuccessful trial strategy does not mean that counsel's performance was deficient. *Avila v. Quarterman*, 560 F.3d 299, 314 (5th Cir. 2009).

Here, the state habeas court credited trial counsels' attestations that their strategy involved showing that (1) APD and Detective Fugitt had "rushed to judgment" in singling out Petitioner as the shooter early in their investigation and (2) the identification of Petitioner as the shooter was questionable due to chaos at the crime scene and inconsistent witness descriptions. Petitioner now claims his trial counsel was ineffective because he believes they should have further investigated the inconsistent witness descriptions and used this evidence to rigorously cross-examine Detective Fugitt regarding his "hasty" decision in settling on Petitioner as the suspect. But this is essentially what the state habeas court found that trial counsel did; simply because it was not effective does not mean it was deficient performance. *See id.* Accordingly, the state habeas court's application of *Strickland* to this claim was not unreasonable, and it is denied.

    *c.  Failure to call an eyewitness expert*

Petitioner next argues trial counsel provided ineffective assistance when they failed to retain, consult, and adduce testimony from an eyewitness expert to show the unreliability eyewitness testimony. Trial counsel responded to this claim as follows:

> 9. <u>Failure to retain an eyewitness identification expert</u>: Retaining and consulting an expert witness was considered by defense counsel, who decided that an expert regarding reliability of eyewitness testimony would not have provided substantially more information beneficial to [Petitioner]'s case, because we knew that we would be able to point out the evidence of multiple conflicting nontestifying eyewitness descriptions of the shooter. We could then use these conflicts to cast doubt on the actual eyewitness testimony in the case without needing to use an expert witness.

> 10. An eyewitness expert would have exposed [Petitioner] to additional risk. After consulting with the defense investigator and reviewing the evidence, it was clear that the most damning State's witnesses were personally acquainted with [Petitioner] and knew him by sight. The State could have used their cross examination of an expert to reinforce the fact that these witnesses' identification testimony of a known individual with whom they were personally acquainted bore

significant indicia of reliability. An expert witness would also have had to admit that these acquainted eyewitness observations supported and reinforced the testimony of the State's witnesses who were not personally acquainted with [Petitioner], and whose descriptions of the shooter's actions were consistent with the descriptions given by the personally acquainted witnesses. This lessened the prospective positive impact of an eyewitness identification expert, and raised the risk that what little such a witness might contribute to the trial could well be negated by the State's cross-examination. In pursuing the strategy chosen, defense counsel was able to elicit through cross examination the fact that there was a range of inconsistent eyewitness descriptions, in an effort to suggest to the jury that a positive, reliable identification of the shooter was clearly difficult. No expert was needed to point this fact out to the jury, and an eyewitness expert would not have contributed significantly to this strategy which was also communicated to the jury in closing argument.

(ECF No. 26-4 at 192). The state habeas court found the following:

> 31. Mr. Hunt considered the use of an eyewitness-identification expert but determined that an expert "would not have provided substantially more information beneficial to [Petitioner]'s case" and that they could use conflicting witness accounts to "cast doubt" on the testimony of [the] State's witnesses.

> 32. Mr. Hunt believed that using an eyewitness expert "would have exposed [Petitioner] to additional risk" because "it was clear that the most damning State's witnesses were personally acquainted with [Petitioner] and knew him by sight." An expert would have had to admit on cross examination with the State that identification of a known individual from people who are "personally acquainted bore significant indicia of reliability."

> 33. Mr. Hunt observes an expert would have had to admit that witnesses who know the [Petitioner] would substantiate the testimony of those who had not met him prior to the murder.

> 34. [Petitioner] has not identified an expert witness that would have assisted with his defense theory of the case involving misidentification or what testimony such an expert would have offered that would have changed the outcome of [Petitioner]'s trial.

> . . . .

> 51. Generally, the failure to call an expert witness does not constitute ineffective assistance of counsel without a showing that the witness was available to testify and that the testimony would have benefited the defendant. *See King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983) ("Counsel's failure to call Witnesses at the guilt-innocence and punishment stages is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony").

52. "We defer to the trial court's determination of trial strategy and his choice of witnesses so long as any conceivable strategy can be imagined for the actions taken or not taken." *Murphy v. State*, 112 S.W.3d 592, 601 (Tex. Crim. App. 2003).

53. Because [Petitioner] has neither suggested that there is an expert witness who would have assisted his defense nor alleged facts that go beyond speculation that an expert may have offered some benefit, [Petitioner] has failed to make the required showing for ineffective assistance of counsel on this ground.

54. Because [Petitioner] has not demonstrated that engaging an eyewitness-identification expert would have overcome the significant evidence of [Petitioner]'s guilt at trial, [Petitioner] has failed to meet his burden of proof to show he was prejudiced by the allegedly deficient performance of trial counsel.

(*Id.* at 185, 187) (record citations omitted).

To prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate the witness was available to testify, delineate the content of the witness's proposed testimony, and show the testimony would have been favorable to the defense. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). Petitioner fails to provide any of this information in his petition. Further, the Fifth Circuit has "repeatedly held that complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegation of what a witness would have stated are largely speculative." *Id*. (citation omitted). The state habeas court credited trial counsels' reasons for not calling an eyewitness expert, and Petitioner has failed to rebut these factual findings with clear and convincing evidence or show that the state habeas court's application of *Strickland* to this claim involved an unreasonable application of clearly established federal law. Accordingly, this claim is denied.

### d. *Failure to obtain DNA testing of Chicago Bulls hat*

Finally, Petitioner argues trial counsel provided ineffective assistance when they failed to obtain DNA testing of a Chicago Bulls hat found at the crime scene. Because the State argued that

the hat belonged to Petitioner, Petitioner argues it was crucial for the hat to be DNA-tested to prove

it wasn't his. Trial counsel responded as follows:

> 12. <u>Failure to test the Chicago Bulls ball cap for DNA</u>: Defense counsel made a strategic decision to not seek DNA testing on the Chicago Bulls ball cap, both because the link between the ball cap and [Petitioner] was weak, and because DNA testing carried substantial risk with very little potential reward to [Petitioner]. If DNA testing had been done and [Petitioner]'s DNA had been excluded, the State could still have argued that [Petitioner] was wearing a similar ball cap during the shooting. If DNA testing had been completed, even under seal, and showed that the cap contained DNA consistent with [Petitioner], the State would have been able to point out to the jury that the cap had been sent by the defense to a DNA testing lab, which would suggest that the Defense was hiding inculpatory DNA test results from the jury.

> 13. Rather than exposing [Petitioner] to the potential downside of a positive DNA test, the Defense chose to employ a lower risk strategy to question the ball cap's relevancy and to show that the State's failure to test the cap furthered the defense "rush to judgment" argument. Attorney Kercher brought out two important points regarding the ball cap in her cross-examination of the only witness to identify it: that the witness had not initially identified any items of clothing when she spoke to the detective, and that she had viewed news coverage regarding the incident including in the days immediately prior to her trial testimony. This news coverage included photographs of [Petitioner] wearing a similar Chicago Bulls ball cap on a different occasion than the shooting.

> 14. Attorney Hunt further questioned detective Fugitt about the ball cap, and pointed out that the two pictured ball caps have both similarities and differences, suggesting that the caps may not have been identical, and additionally pointed out that Chicago Bulls ball caps of the type depicted in the photographs are not uncommon. Attorney Hunt also questioned detective Fugitt about the fact that the State did no DNA testing on the ball cap, which further supported the defense's "rush to judgment" argument. Moreover, the State did not rely heavily on the ball cap in its case or during their argument. This chosen strategy enabled the defense to question the State's lack of investigation without running the risk of potentially creating inculpatory evidence.

(ECF No. 26-4 at 192-93.) The state habeas court found the following:

> 55. Absent any factual assertions or evidence indicating what DNA testing would have shown, [Petitioner]'s claim is mere "after-the-fact speculation" about how DNA testing would have furthered the defense theory of the case, which cannot form the basis for a claim of ineffective assistance of counsel. *Flemming v. State*, 949 S.W.2d 876 (Tex. App.--Houston [14th Dist.] 1997, no writ).

56. Contrary to [Petitioner]'s claim that "there can be no strategic nor tactical reason" for opting not to test [Petitioner]'s hat for the presence of his DNA, trial counsels' strategy behind this decision was reasonable.

57. [Petitioner] has not demonstrated that the decision to not conduct DNA testing on the hat was objectively unreasonable or that there is a reasonable probability that, had testing been conducted and [Petitioner]'s DNA was not found on that hat, the result of the trial would have been different.

(*Id.* at 187-88.)

As previously noted, "[d]efense counsel's 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Mejia*, 906 F.3d at 316) (citation omitted). Here, trial counsel reasoned that the benefits of DNA testing—potentially excluding the hat as belonging to Petitioner—were outweighed by the risks, which included the DNA inculpating Petitioner, as well as the jury believing the defense was hiding inculpating evidence. In his federal petition, Petitioner restates his state-court arguments and does not explain how the state habeas court's decision to deny this claim was an unreasonable application of clearly established federal law. As a result, the Court concludes that that state habeas court's application of *Strickland* was not unreasonable, and this claim is denied.

## 4. Withholding of exculpatory evidence (claim 4)

Petitioner next argues that the police and prosecution withheld exculpatory/impeachment evidence, specifically the entire audio recording of Latoya Walker's interview with police. Petitioner argues that the "interview summary" he received did not include audio showing that Walker only identified Petitioner as the shooter so she could be released from custody; further, Petitioner argues the entire police interview with Ms. Walker was leading.

The state habeas court recommended denying this claim based on the following:

61. [Petitioner] claims that *Brady* was violated when the police did not turn over the audio recording of their interview with Latoya Walker, a witness who identified

[Petitioner] as the shooter. He also alleges that "the showup procedure and other questionable witness practices" constituted further misconduct that prejudiced him.

62. A prosecutor has an affirmative duty to disclose favorable evidence that is material either to guilt or punishment. *See Brady v. Maryland*, 373 U.S. 83, 86 (I983); *McFarland v. State*, 928 S.W.2d 482, 511 (Tex. Crim. App. I996).

63. To succeed in showing a *Brady* violation, an individual must show that (1) the evidence is favorable to the accused; (2) the evidence was suppressed by the State either inadvertently or willfully; and (3) the suppression of the evidence resulted in prejudice (i.e., materiality). *Ex parte Reed*, 271 S.W.3d 698, 726-27 (Tex. Crim. App. 2008).

64. The Discovery Compliance Statement in this case, which documents each item of discovery that was disclosed by the State to the defense, was signed by the prosecutor, Mr. Hunt, and [Petitioner].

65. Contrary to [Petitioner]'s claim, the Discovery Compliance Statement affirms that the State disclosed a .wav and .mp3 format recording of Ms. Walker's interview on February 8, 2017[,] and a digital mobile audio video (DMAV) format of the recording on March 30, 2017.

66. Because [Petitioner] has failed to show that the State suppressed the recording of the police interview of Ms. Walker, he has not demonstrated that a *Brady* violation occurred.

67. The Court assumes that [Petitioner]'s claim that "the showup procedure" amounted to police misconduct refers to the officers' interactions with Ms. Gibbs.

68. As discussed above, Ms. Gibbs did not testify that she identified [Petitioner].

69. [Petitioner] fails to identify what "other questionable practices" by police or prosecutors form the basis of this claim.

70. Because [Petitioner] has not proven that the State failed to disclose recordings of interviews with Ms. Walker, he has not met his burden to demonstrate police or prosecutorial misconduct. *Ex parte Reed*, 271 S.W.3d 698, 726-27 (Tex. Crim. App. 2008) (requiring a showing that evidence was suppressed by the government to sustain a *Brady* claim).

71. [Petitioner] has failed to prove that the State violated [Petitioner]'s right to due process.

(ECF No. 26-4 at 188-89) (record citations omitted).

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In order to establish a *Brady* violation, a petitioner must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to either guilt or punishment. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Graves v. Cockrell*, 351 F.3d 143, 153-54 (5th Cir. 2003).

Here, the state habeas court concluded the State provided Petitioner with audio recordings of Ms. Walker's custodial interviews on February 8 and March 30, 2017. Petitioner does not address these findings in his federal petition, and therefore fails to rebut their presumption of correctness with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Accordingly, because Petitioner does not show that the prosecution suppressed material evidence, he cannot establish a *Brady* violation. This claim is denied.

5. Actual innocence (claim 5)

In Petitioner's final claim, he argues he is actually innocent and that he was convicted based on the prejudicial and false eyewitness testimony. Respondent argues that Petitioner's claim is not cognizable in a federal habeas corpus petition.

Freestanding claims of actual innocence based on newly discovered evidence do not provide a basis for federal habeas relief. *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000) (citing *Herrera v. Collins*, 506 U.S. 390, 417 (1993)). "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Herrera*, 506 U.S. at 399. Although the *Herrera* court left open the question of whether, in a capital case, "a truly persuasive demonstration of 'actual

innocence' made after trial would . . . warrant habeas relief if there were no state avenue open to process such a claim," 506 U.S. at 417, the Fifth Circuit has consistently rejected this theory. *See Cantu v. Thaler*, 632 F.3d 157, 167 (5th Cir. 2011); *In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009); *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003) (collecting cases). Accordingly, this claim is denied.

### IV. Certificate of Appealability

A petitioner may not appeal a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the district court must issue or deny a certificate of appealability (COA) when it enters a final order adverse to the applicant. *See Miller-El v. Cockrell,* 537 U.S. 322, 335-36 (2003) (citing 28 U.S.C. § 2253(c)(1)).

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). In cases where a district court rejects a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a district court rejects a habeas petition on procedural grounds without reaching the constitutional claims, "a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the dismissal or denial of the Petitioner's § 2254 petition on substantive or procedural grounds, nor find that the issues presented are

adequate to deserve encouragement to proceed. *Miller-El*, 537 U.S. at 327 (citing *Slack*, 529 U.S. at 484). Accordingly, the Court will not issue a certificate of appealability.

It is therefore **ORDERED** that Petitioner's petition for writ of habeas corpus (ECF No. 1) is **DENIED**.

It is further **ORDERED** that a certificate of appealability shall not issue.

SIGNED this 5th day of February, 2024.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE